## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| MIRANDA WAITES, individually, | ) | |
| and as administratrix of the estate | ) | |
| of MARK TINSLEY, deceased, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 5:14-cv-02181-CLS |
| | ) | |
| LIMESTONE CORRECTIONAL | ) | |
| FACILITY; *et al*., | ) | |
| | ) | |
|     Defendants. | ) | |

### MEMORANDUM OPINION AND ORDERS

Plaintiff, Miranda Waites, sues in her representative capacity as administratrix of the estate of her deceased father, Mark Tinsley, who died while committed to the custody of the Alabama Department of Corrections. The cause of his death was attributed to pneumonia that progressed into acute respiratory distress syndrome. Plaintiff contends, however, that the proximate cause of her father's death was the deliberate indifference to serious medical needs exhibited by employees of Corizon Medical Services, LLC, an entity retained by the Alabama Department of Corrections to provide healthcare services to inmates of the State's prisons.

Three motions are pending: defendants' motion for summary judgment (doc. no. 49); defendants' motion to exclude the testimony of plaintiff's expert witness (doc. no. 55); and, plaintiff's motion to strike (doc. no. 69). Following consideration of the

parties' briefs and evidentiary submissions, the court concludes that plaintiff's motion to strike is due to be denied, defendants' motion for summary judgment should be granted, and, as a result of the foregoing decisions, defendants' motion to exclude the testimony of plaintiff's expert witness becomes a moot issue.

## I. PRELIMINARY CONSIDERATIONS

### A.    The Remaining Defendants

The complaint filed by Miranda Waites alleged claims against nine individuals,[1] two entities,[2] and a number of fictitious defendants.[3]    The five individual defendants directly employed by the Alabama Department of Corrections[4] were dismissed by the memorandum opinion and order granting the motion filed by those parties.[5]    That same

---

[1] The nine individual defendants may be divided into two groups: *those five persons directly employed by the Alabama Department of Corrections — i.e.*, (1) *Dewayne Estes*, Warden of the Limestone Correctional Facility; (2) *Ruth Naglich*, Associate Commissioner for Health Services for the Alabama Department of Corrections; (3) *Guy Noe*, Assistant Warden of the Limestone Correctional Facility; (4) *Jimmy Patrick*, Assistant Warden of the Limestone Correctional Facility; (5) *Kim Thomas*, Commissioner of the Alabama Department of Corrections) — *and*, *those four individuals employed by Corizon Medical Services, LLC, a contractor of the Alabama Department of Corrections: i.e.*, (6) *Dr. Randall Stubbs*, M.D.; (7) *Shahla Poursaied*, a Certified Registered Nurse Practitioner; (8) *Rose Jackson*, a Licensed Nurse Practitioner; and (9) *Natasha Lopez*, a Licensed Nurse Practitioner.

[2] The entities named as defendants were the *Limestone Correctional Facility*, "an agency of the Alabama Department of Corrections," and *Corizon Medical Services, LLC* (identified in the complaint as "Defendant Corizon . . . a healthcare company that provides patient care to Limestone **County** [sic] Correctional Facility . . . ."  Doc. no. 1 (Complaint), ¶¶ 8 and 20, respectively (ellipses, boldface, and italicized emphasis supplied).

[3] *See, e.g., id.*, ¶¶ 14-15, 21-25.

[4] *See supra* note 1 (identifying defendants (1) through (5), inclusive).

[5] *See* doc. no. 14 (Motion to Dismiss Filed by Defendants Thomas, Estes, Patrick, Noe, Naglich, and ADOC Fictitious Parties); and doc. no. 26 (the memorandum opinion and order addressing the

opinion struck plaintiff's claims against "the Limestone Correctional Facility" and the fictitious parties.[6]   A sixth individual, *Dr. Randall Stubbs, M.D.*, died during the pendency of this action,[7] and a suggestion of his death was filed on April 8, 2015.[8] Plaintiff did not move to substitute another party in accordance with the Federal Rules,[9] but instead stipulated that her claims against Dr. Stubbs should be dismissed.[10]   Thus, this

─────────────────────────────

foregoing motion), at 13.  *Note well* the inexplicable "Stipulation of Dismissal" filed by plaintiff's counsel on Aug. 12, 2016, *seventeen months and ten days after the foregoing memorandum opinion and order of dismissal*, and stating:

> COMES NOW, the Plaintiff, Miranda Waites, and requests this Court dismiss all claims against Defendants Alabama Department of Corrections, Commissioner Kim Thomas, Warden Dwayne Estes, Assistant Warden Jimmy Patrick, Assistant Warden Guy Noe and Ruth Naglich and any other named individual defendants of the Alabama Department of Corrections, with prejudice, and each party to bear its own costs.

Doc. no. 60 (Stipulation of Dismissal).  Perhaps plaintiff's counsel believed that the "Alabama Department of Corrections" had been named as a defendant, but a careful reading of the complaint discloses that no claim against that entity was alleged within its four corners.

[6] *See* doc. no. 26 (Memorandum Opinion and Order on Motion to Dismiss), at 7 & n.20 (dismissing claims against "Limestone Correctional Facility"); and *id.* at 8 (striking plaintiff's claims against the fictitious defendants because her complaint had not described those persons with sufficient specificity.  *See, e.g., Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010); *Dean v. Barber*, 951 F.2d 1210, 1215-16 (11th Cir. 1992)).

[7] Doc. no. 51-1 (Hood Affidavit), ¶ 10 ("Dr. Stubbs died on February 2, 2015 at the age of fifty-one (51).").

[8] *See* doc. no. 29 (Suggestion of Death).

[9] *See, e.g.*, Fed. R. Civ. P. 25(a)(1) ("If a party dies and the claim is not extinguished, the court may order substitution of the proper party.  A motion for substitution may be made by any party or by the decedent's successor or representative.  *If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed*.") (emphasis supplied).

[10] *See* doc. no. 66 (Plaintiff's Responsive Brief), at 43 ("Plaintiff agrees that she did not substitute Dr. Stubbs's estate after his death, and therefore concedes the dismissal of those claims against him individually.  Dr. Stubbs's actions, however, are still relevant to the liability of Corizon, both under Plaintiff's federal and state law claims.").

opinion addresses the claims asserted against the remaining defendants: Certified Registered Nurse Practitioner *Shahla Poursaied*; Licensed Nurse Practitioners *Rose Jackson* and *Natasha Lopez*; and, *Corizon Medical Services, LLC*, the health-care provider that employed those individuals.

B.     **Plaintiff's Motion to Strike**

Plaintiff contends that: (a) the affidavits of Shahla Poursaied and Natasha Lopez should be stricken because they were submitted after the conclusion of discovery; (b) Shahla Poursaied's affidavit should be stricken on the additional ground that it is a "sham"; (c) the affidavits of Shahla Poursaied and Natasha Lopez and two non-party physicians, Dr. Jack Hasson and Dr. George Lyrene, should be stricken because they contain improper opinion testimony and legal conclusions; and (d) the affidavit of non-party Dr. George Lyrene should be stricken on the additional ground that his deposition testimony established that he misconstrued the applicable standard of care.[11]

1.     **Submission after the close of discovery**

There is no procedural rule or case law requiring that an affidavit submitted in support of a party's motion for summary judgment must be executed and disclosed to the opposing party before the close of discovery. Hence, the motion to strike the affidavits of Shahla Poursaied and Natasha Lopez on that ground is overruled.

---

[11] Doc. no. 69 (Plaintiff's Motion to Strike), ¶¶ 16-24.

4

### 2.    "Sham" affidavit

A party "cannot give 'clear answers to unambiguous questions' in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) (quoting *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)). When that occurs, courts "may disregard the affidavit as a sham." *Id.* (citing *Van T. Junkins*, 736 F.2d at 658-59). Even so, that rule should be applied "sparingly" due to the harsh effect it may have upon a party's case. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010); *Allen v. Board of Public Education for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007) (same); *Rollins*, 833 F.2d at 1530 (same).

District courts also are advised to be "careful to distinguish 'between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.'" *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). That is because

> every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition.

*Id.* at 954 (quoting *Kennett–Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980))

(alteration in original) (citation omitted); *see also Faulk v. Volunteers of America*, 444

F. App'x 316, 318 (11th Cir. 2011) (same).

Moreover, a mere discrepancy between deposition testimony and a subsequent

affidavit will not justify a district court in refusing to accept the evidence. *See Tippens*,

805 F.2d at 954; *Kennett-Murray*, 622 F.2d at 894.

> To allow every failure of memory or variation in a witness's testimony to
> be disregarded as a sham would require far too much from lay witnesses
> and would deprive the trier of fact of the traditional opportunity to
> determine which point in time and with which words the witness . . . was
> stating the truth. Variations in a witness's testimony and any failure of
> memory throughout the course of discovery create an issue of credibility
> as to which part of the testimony should be given the greatest weight if
> credited at all. Issues concerning the credibility of witnesses and weight
> of the evidence are questions of fact which require resolution by the trier
> of fact. An affidavit may only be disregarded as a sham "when a party has
> given clear answers to unambiguous questions which negate the existence
> of any genuine issue of material fact . . . [and that party attempts] thereafter
> [to] create such an issue with an affidavit that merely contradicts, without
> explanation, previously given clear testimony."

*Tippens*, 805 F.2d at 953-54 (quoting *Van T. Junkins*, 736 F.2d at 657) (ellipses and

alterations in original). Thus, the court must "find some inherent inconsistency between

an affidavit and a deposition before disregarding the affidavit." *Rollins*, 833 F.2d at

1530.

The foregoing principles now will be applied to the affidavit of Certified

Registered Nurse Practitioner Shahla Poursaied, who states in one part of her sworn

statement that: "To the extent the Plaintiff claims that I or another member of

Limestone's medical staff failed to do something related to Mr. Tinsley's medical care, I absolutely deny such allegations."[12] Plaintiff contends that statement cannot be reconciled with Poursaied's previous deposition testimony,[13] and points to several excerpts from that deposition in which Poursaied testified that she could not offer an opinion on the level of care provided to Mark Tinsley because she "was not there" when treatment was administered.[14] When asked for her opinion about the level of care that should have been provided, Poursaied responded: "Since I was not there, I don't have an opinion . . . ."[15]

The failure of defense counsel to better prepare his witness for deposition cannot be applauded, but that is not the issue. Nurse Poursaied's affidavit states that, *after the date of her deposition*, she reviewed Mark Tinsley's medical records. Based upon that assertion, this court concludes that the contrasts between her deposition testimony and

---

[12] Doc. no. 51-5 (Poursaied Affidavit), ¶ 17.

[13] Doc. no. 69 (Plaintiff's Motion to Strike), ¶¶ 10-13.

[14] *See* doc. no. 51-6 (Poursaied Deposition), at 58-59 ("**Q.** Okay. So did this LPN overreact by calling the doctor? Because she was obviously concerned about that saturation level. **A.** *I was not there. I cannot make that call.*"); *id.* at 61 ("**Q.** Now, would you agree at this point in time after having an upper respiratory infection . . . that Mr. Tinsley should see a doctor? **A.** *I was not there. I cannot make that call.*"); *id.* ("**Q.** That he should see someone? You can't even make the call he should actually see someone? . . . **A.** *I still cannot make that call. I was not there.*"); *id.* at 71 ("**Q.** And are you still of the opinion that the LPN that saw him on the 3rd is in compliance with the standard of care of how to treat an individual such as Mr. Tinsley? . . . **A.** *I was not there. I cannot say.*") (emphasis and ellipses supplied).

[15] *Id.* at 74 (ellipsis supplied).

subsequent affidavit do not justify striking the latter altogether.[16]   Poursaied's subsequent review enabled her to provide a more complete evaluation by affidavit than she had given during deposition.   *See Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1170 (7th Cir. 1996) (stating that an affidavit inconsistent with prior deposition testimony is properly admissible if the affiant lacked access to material facts during the prior deposition); *Delaney v. Deere & Co.*, 219 F.3d 1195, 1196 n.1 (10th Cir. 2000) ("While a party may not defeat summary judgment by contradicting deposition testimony in a subsequent affidavit, new evidence may furnish a good faith basis for the inconsistency."); *Bushell v. Wackenhut International, Inc.*, 731 F. Supp. 1574, 1578 (S.D. Fla. 1990) (third party's deposition testimony can lend credence to subsequent affidavit).   Accordingly, the motion to strike Shahla Poursaied's testimony as a "sham" is denied.

### 3.    Improper opinion testimony and legal conclusions

Plaintiff alleges that the affidavits of defendants Shahla Poursaied, Rose Jackson, Natasha Lopez, and non-party physicians Dr. Jack Hasson and Dr. George Lyrene "contain opinion testimony that amounts to blanket assertions of how a case should be decided and legal implications of conduct."[17]   Plaintiff argues that the subject "affidavits contain blanket assertions . . . that the Defendants were in compliance with all applicable

---

[16] Doc. no. 51-5 (Poursaied Affidavit), ¶ 6.

[17] Doc. no. 69 (Plaintiff's Motion to Strike), ¶ 15; *see also id.*, ¶ 17.

standards of care,"[18] but contends that the affiants failed to provide either an adequate factual basis for such assertions, or any "explanation as to what constitutes 'the standard of care.'"[19] The rub lies in the fact that plaintiff failed to identify the specific statements within each affidavit that she characterized as "blanket assertions."

It is true, as the Second has Circuit observed, that a witness should not provide testimony that "amounts to no more than an expression of the [witness'] general belief as to how the case should be decided." *Marx & Company, Inc. v. Diners' Club Inc.*, 550 F.2d 505, 510 (2nd Cir. 1977) (citation omitted, alteration in original). It also is not proper, as the former Fifth Circuit observed, for a witness to offer his or her opinion on the law of the forum, or to provide legal conclusions. *Helms v. Sinclair Refining Co.*, 170 F.2d 289, 292 (5th Cir. 1948). Those admonitions about legal conclusions should be contrasted with opinions on the facts.

> While an expert's *legal conclusions* are not admissible, an opinion as to the ultimate *issue of fact* is admissible, so long as it is based upon a valid scientific methodology and supported by facts. *See* Fed. R. Evid. 704. The "ultimate issue of fact," as used in Rule 704, means that the expert furnishes an opinion about inferences that should be drawn from the facts and the trier's decision on such issue necessarily determines the outcome of the case.

*Strickland v. Royal Lubricant Company, Inc.*, 911 F. Supp. 1460, 1469 (M.D. Ala. 1995) (emphasis supplied).

---

[18] *Id.*, ¶ 18 (ellipsis supplied).

[19] *Id.*, ¶ 19.

9

Here, each of the challenged affidavits includes a lengthy factual summary that serves as the foundation for the witness's opinion.[20] Additionally, because the parties are under the impression that plaintiff's poorly structured complaint alleges that defendants failed to comply with the standard of care established by the "Alabama Medical Liability Act,"[21] expert medical testimony establishing the applicable standard of care is relevant. *Cf., e.g., Barton v. American Red Cross*, 829 F. Supp. 1290, 1302 (M.D. Ala. 1993) ("Under Alabama law, the general rule in medical malpractice cases is that expert medical testimony is required to establish proper medical procedure.") (citing *Plitt v. Griggs*, 585 So. 2d 1317, 1325 (Ala. 1991)).[22] Thus, the challenged witnesses may offer opinions about defendants' compliance with the applicable standard of care, and this aspect of the motion to strike also will be overruled. *See* Fed. R. Evid. 704(a); *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977) ("Rule 704 abolishes the per se rule against testimony regarding ultimate issues of fact. By the same token, however, courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable

---

[20] *See* doc. no. 51-5 (Poursaied Affidavit); doc. no. 52-1 (Lopez Affidavit); doc. no. 53-3 (Lyrene Affidavit); doc. no. 53-4 (Hasson Affidavit).

[21] *See, e.g.*, doc. no. 50 (Defendants' Brief), at 33-37; doc. no. 66 (Plaintiff's Brief), at 35-43.

[22] A plaintiff asserting a claim based upon the "Alabama Medical Liability Act" must ordinarily present expert testimony from a similarly-situated healthcare provider establishing the appropriate standard of care, a deviation from that standard, and a causal connection between the deviation and the injury at issue. *See, e.g., Lyons v. Walker Regional Medical Center*, 791 So. 2d 937, 942 (Ala. 2000).

law.").

### 4.    Lyrene affidavit

Plaintiff asserts that Dr. George Lyrene's affidavit testimony should be stricken because he testified during his deposition that "the standards of care applicable to a correctional facility are different from those applicable in the free world."[23] Specifically, Dr. Lyrene testified as follows:

> Q.    But you would agree with me that *the standard of care is the same inside a correctional facility that* [*sic*] *is in the free world?*
>
> A.    *No.*    The standard of care in the free world is determined by the ability to pay, and that's not the case in prisons.
>
> Q.    Is your opinion that the standard of care is determined by someone's ability to pay?
>
> A.    Oh, absolutely.
>
> Q.    Explain that to me.
>
> A.    If you have osteoarthritis of the hip in the free world and no insurance, you can forget about showing up in an orthopedic [*sic*]; they won't see you.

Doc. no. 68-1 (Lyrene Deposition), at 94 (emphasis and alterations supplied).

Plaintiff relies upon *McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004), in which the Eleventh Circuit stated that the "standard of care applicable to nurses is universal, and does not diminish when the setting is a jail rather than hospital."    *Id.* at

---

[23] Doc. no. 69 (Plaintiff's Motion to Strike), ¶ 22.

11

1296.    Defendants  respond  that  plaintiff  misconstrued  Dr.  Lyrene's  testimony.
According  to  them,  Dr.  Lyrene  did  not  intend  to  testify  that  the  *standard  of  care*  in  a
prison  setting  is  *lower  than*  the  standard  that  applies  to  medical  treatment  in  the  free
world.    Instead,  they  say,  Dr.  Lyrene's  testimony  was  intended  to  illustrate  that  the
*availability  and  quality  of  medical  care  in  prisons*  does  not  depend  upon  a  patient's
ability to pay.[24]

Plaintiff's  argument  is  rejected.    Dr.  Lyrene  did  not  answer  the  question  asked.
Instead,  he  stated  his  belief  that  a  person  who  presented  to  a  hospital  or  doctor  in  the  free
world  with  neither  medical  insurance  nor  money  to  pay  for  the  needed  services  would
either  receive  no  care,  or  a  lower  standard  of  care,  than  a  convict  involuntarily
incarcerated  in  a  state  prison.    Nothing  in  his  deposition  testimony  indicates  that  he
believed  a  lower  standard  of  medical  care  is  owed  to  convicts  involuntarily  incarcerated
in a state prison.

## II.  STANDARDS FOR EVALUATING MOTIONS FOR SUMMARY JUDGMENT

Federal  Rule  of  Civil  Procedure  56  states  that  a  "court  shall  grant  summary
judgment  if  the  movant  shows  that  there  is  no  genuine  dispute  as  to  any  material  fact  and
the  movant  is  entitled  to  judgment  as  a  matter  of  law."    Fed.  R.  Civ.  P.  56(a).    Thus,
summary  judgment  is  proper  "after  adequate  time  for  discovery  and  upon  motion,  against

---

[24] Doc. no. 76 (Defendants' Response to Plaintiff's Motion to Strike), at 9.

a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover, the

> mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921). If the evidence supporting the nonmoving party is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *see also id.* at 251-52 (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

The non-moving party's failure of proof as to any essential element renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

## III. SUMMARY OF FACTS

Mark Tinsley spent thirty-three years in various law enforcement positions,[25] but was convicted during the summer of 2012 of an offense involving "sexual conduct with an individual or individuals under the age of 12."[26]  He was sentenced to imprisonment for a term of twelve years on August 6, 2012,[27] and taken into custody by the Jefferson County Sheriff.

Plaintiff testified that her father suffered from obstructive sleep apnea, and began using a "continuous positive airway pressure" (CPAP) machine to treat the disorder in

---

[25] Neither plaintiff nor defendants provided details of Mark Tinsley's law enforcement career. Even so, an obituary published in a Sylacauga, Alabama, daily newspaper stated that, over the course of thirty-three years, he served in "such positions as a police officer, officer with [the] Bureau of Prisons, and bailiff with the Birmingham court system." *Mark Luke Tinsley: Obituary*, THE DAILY HOME, Nov. 19, 2013, http://www.legacy.com/obituaries/dailyhome/obituary.aspx?n= mark-luke-tinsley&pid=168088233& (alteration supplied) (last visited June 9, 2017).

[26] Doc. no. 52-2 (Waites Deposition), at 62-63 ("**Q**. Did it [*the offense of conviction*] involve an allegation that he had engaged in sexual conduct with an individual or individuals under the age of 12?  **A**. Yes, sir.") (alteration supplied).  The record does not otherwise identify the offense, but perhaps it was a violation of Ala. Code § 13A-6-69.1 (1975).

[27] *See* doc. no. 51-4, at ECF 2 (showing "SENTENCE DATE 8/6/12").  *Nota bene*:  "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing").  *See The Bluebook:  A Uniform System of Citation*, Rule 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010).  When this court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters "ECF."

either 1996 or '97.[28] He regularly used the device before the date of his sentencing.[29] Consequently, plaintiff delivered her father's CPAP machine to the Jefferson County Jail, but she did not know whether he was allowed to use the unit while incarcerated there.[30]

Tinsley was transferred from the Jefferson County Jail to Kilby Correctional Facility in Mt. Meigs, Alabama, on September 4, 2012.[31] Kilby is one of the fifteen major prison facilities operated by the Alabama Department of Corrections.[32] A medical examination by a registered nurse is part of the standard "New Arrival Intake Screening" process.[33] One of those screening documents — *i.e.*, "Form 4" authored by Registered

---

[28] *See* doc. no. 52-2 (Waites Deposition), at 101-102. CPAP devices typically are prescribed following a physician-supervised sleep study, and use pressurized air flow to prevent the windpipe from closing during sleep. *See* doc. no. 50 (Defendants' Brief), ¶ 14; doc. no. 53-4 (Hasson Affidavit), ¶ 16. Tinsley underwent a sleep study at the Sleep/Wake Disorders Center operated by the University of Alabama in Birmingham during December of 2009, and evaluation of the data recorded during that procedure resulted in a recommendation that he continue using a CPAP machine. Doc. no. 68-11 (2009 UAB Sleep Study), at ECF 14-20.

[29] Doc. no. 52-2 (Waites Deposition), at 103, 105, 109.

[30] *Id.* at 108 ("**Q.** Do you recall how you took the CPAP machine to him? **A.** I took it and just dropped it off with him [at the Jefferson County Jail].") (alterations supplied); *id.* at 110 ("**Q.** Do you know whether he utilized the CPAP machine while he was incarcerated at the Jefferson County Jail? **A.** *I'm not positive of anything. I know he had it, but I'm not positive of anything. I wasn't there.*") (alteration and emphasis supplied); *id.* at 177 ("**Q.** Do you know if Mr. Tinsley had access to a CPAP machine while he was at the Jefferson County Jail? **A.** Yeah, after he was convicted I took it to him. **Q.** Do you know if he utilized it? **A.** I know he had it. **Q.** You just don't know if he used it? **A.** *I'm not sure. I wasn't there.*") (emphasis supplied).

[31] *See* doc. no. 50 (Defendants' Brief), ¶ 12; doc. no. 50-1 (Hood Affidavit), ¶ 21.

[32] *See* http://www.doc.state.al.us/FacAddr.aspx (last visited June 14, 2017).

[33] *See* doc. no. 50 (Defendants' Brief), ¶ 16; doc. no. 50-1 (Hood Affidavit), ¶ 22.

Nurse Rebekah Stough on September 11, 2012[34] — recorded that Tinsley responded "yes" to the following medical conditions when asked "Do you now [have] or have you ever been treated for": Loss of Consciousness; Vision Problems; Heart Condition ("SVT");[35] High Blood Pressure; Asthma ("Hx" [*i.e., a history of asthma*]); Gastritis ("IBS");[36] Arthritis/Joint Muscle; Back/Neck; Psychiatric History ("PTSD");[37] and Hay Fever/Allergies.[38] Another document authored by a different nurse on September 17, 2012 recorded that Tinsley "Reported H/O [*i.e., a history of*] Sleep Apnea,"[39] but nothing on that form indicates that Tinsley stated he previously had used, or then had a need for, a CPAP machine.

---

[34] Doc. no. 51-4 (Ex. 3 to Hood Affidavit), at ECF 10 (COR018).

[35] SVT is an abbreviation standing for the Latin phrase, *supraventricular tachycardia.* "Supraventricular" means "situated or occurring superior to the ventricles, especially is an atrium or atrioventricular node," and "tachycardia" defines an "excessive rapidity in the action of the heart; the term is usually applied to a heart rate above 100 beats per minute in an adult and is often qualified by the locus of origin." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1795 and 1850, respectively (30th ed. 2003). Hence, the two terms together refer to "any regular tachycardia in which the point of stimulation is located above the bundle branches [of the heart], either in the sinus node, atria, or atrioventricular junction." *Id.* (alteration supplied).

[36] IBS is an acronym formed from the first letters of the phrase "*irritable bowel syndrome.*"

[37] PTSD is an acronym formed from the first letters of the phrase "*post traumatic stress disorder.*"

[38] Doc. no. 51-4 (Ex. 3 to Hood Affidavit), at ECF 10 (COR018). *See also* doc. no. 50 (Defendants' Brief), ¶ 17 ("During his intake at Kilby, Mr. Tinsley reported to the medical staff that he suffered or had suffered from several medical and mental health conditions, including hypertension, PTSD, sleep apnea, a history of supraventricular tachycardia, and a 'history' of asthma."); doc. no. 51-1 (Hood Affidavit), ¶ 23 (same).

[39] Doc. no. 51-4 (Ex. 3 to Hood Affidavit), at ECF 17 (COR032) (alteration supplied). *See also* doc. no. 51-1 (Hood Affidavit), ¶ 23 (stating in the last sentence that "[t]here is no indication in the intake records from Kilby that Mr. Tinsley notified the Kilby medical staff that he owned, used or ever relied upon a CPAP machine." (alteration supplied)).

Tinsley was transferred from Kilby to Limestone Correctional Facility in Atmore, Alabama, on September 28, 2012.[40] He was subjected to another physical examination and orally instructed on the manner of obtaining access to the prison's health care services.[41] Due to his prior employment in law enforcement positions, Tinsley was assigned to Limestone's protective custody unit, or "E-Dorm," which is segregated from the general prison population.[42] For security reasons, inmates housed in that unit did not leave the dormitory to participate in "pill call": a process during which nursing staff distributed prescription medications to inmates within the general prison population.[43] Instead, prescription medications were separately dispensed to inmates within the E-Dorm.[44] Occupants of that secure facility also received medical treatment in Limestone's Health Care Unit at times different from general population inmates.[45]

Protective custody inmates desiring medical attention were "required to complete the top portion of [a] sick call request form (stating their name, the date of request, AIS number,[46] date of birth, dorm location, the nature of the problem or request and their

---

[40] Doc. no. 50 (Defendants' Brief), ¶ 19.

[41] *Id.*, ¶ 21; doc. no. 51-1 (Hood Affidavit), ¶ 24.

[42] Doc. no. 50 (Defendants' Brief), ¶ 20.

[43] Doc. no. 51-1 (Hood Affidavit), ¶ 17.

[44] Doc. no. 52-1 (Lopez Affidavit), ¶ 6 (alteration supplied).

[45] *Id.*

[46] The Alabama Institutional Serial number ("AIS number") is a unique six-digit number assigned to each inmate incarcerated by the Alabama Department of Corrections. *See* http://www.corrections.com/links/link/36544 (*last visited* June 26, 2017).

signature).["47"]   The form then could be *either* handed directly to a nurse dispensing medications during "pill call" in the E-Dorm, *or* deposited in a lock box located within the dormitory.   "In either event, the medical staff [brought] the sick call requests back to the Health Care Unit where they [were] received by the medical records clerk or a nurse" and evaluated.["48"]   If the medical complaint or problem described on an inmate's sick-call request form appeared to be urgent or life-threatening, medical staff could direct that the inmate be brought immediately to Limestone's Health Care Unit for treatment.["49"] Otherwise, medical staff compiled a list of those inmates who submitted sick call request forms and,

> in the case of protective custody inmates within Limestone, a nurse [would be] sent to E-Dorm to conduct sick call by taking the requesting inmate's vital signs, discussing the inmate's complaints, and either:   (1) providing the inmate with medical treatment that [could] be provided [within E-Dorm] under the nursing protocols, or (2) referring the inmate to the physician or nurse practitioner on staff at Limestone.   If an inmate [submitted] more than one . . . sick call request form on the same day, the sick call nurse [would] address each complaint utilizing the appropriate nursing encounter tool ("NET") and provide appropriate treatment and/or referral to a medical provider if indicated.

Doc. no. 51-1 (Affidavit of Hugh Hood, M.D., Corizon's Associate Regional Medical Director), ¶ 15 (alterations and ellipsis supplied).

Mark Tinsley acknowledged receiving, reading, and comprehending the "Access

---

["47"] Doc. no. 51-1 (Hood Affidavit), ¶ 14 (alteration and footnote supplied).

["48"] *Id.* (alterations supplied).

["49"] *Id.*, ¶ 16.

to Health Care" information sheets detailing the procedures for obtaining medical care while incarcerated at Limestone — information that described the "sick call" and "pill call" procedures discussed above.[50] He participated in both procedures on several occasions between September 28, 2012 and late-October of the following year, as demonstrated by these facts: he requested medical and dental care through the sick call process on several occasions; and, he regularly participated in pill call during his incarceration.[51]

The Alabama Department of Corrections contracted with defendant Corizon Medical Services, LLC ("Corizon"), to provide comprehensive medical services within each of the penal facilities operated by the Department, including both Kilby and Limestone Correctional Facilities.[52] Corizon employed Dr. Randall Stubbs, a Board Certified Internal Medicine specialist (with sub-specialities in Pulmonary Disease and Sleep Medicine),[53] as the Medical Director at Limestone Correctional Facility. He provided and also supervised medical care from March 1, 2013 until his death on February 2, 2015: more than a year after Mark Tinsley's death.[54]

Corizon also employed Certified Registered Nurse Practitioner Shahla Poursaied

---

[50] Doc. no. 50 (Defendants' Brief), ¶ 22; doc. no. 51-1 (Hood Affidavit), ¶ 26.

[51] Doc. no. 52-1 (Lopez Affidavit), ¶ 10; doc. no. 51-1 (Hood Affidavit), ¶ 28.

[52] Doc. no. 50 (Defendants' Brief), ¶ 1; doc. no. 51-1 (Hood Affidavit), ¶ 3.

[53] *See* doc. no. 51-1 (Hood Affidavit), ¶ 9.

[54] Doc. no. 50 (Defendants' Brief), ¶ 5; doc. no. 51-1 (Hood Affidavit), ¶¶ 8-10.

19

to provide medical care and treatment to inmates incarcerated at Limestone.[55] She was primarily responsible for the oversight and management of medical care provided to inmates with chronic medical conditions.[56]

Licensed Practical Nurses Rose Jackson and Natasha Lopez also were Corizon employees.[57] They were primarily responsible for "distributing prescribed medications to inmates during pill call, performing sick call triage, collecting sick call request forms, performing medical intake for new inmates, and assisting other members of the medical staff" within Limestone's Health Care Unit.[58]

Natasha Lopez often conducted pill call in E-Dorm, and occasionally discussed medical issues with Mark Tinsley. Notably, however, Tinsley did not mention his need for a CPAP machine, or otherwise complain of obstructive sleep apnea during his conversations with Lopez.[59]

Rose Jackson also distributed medications to Mark Tinsley during pill call. Again, however, there are no records indicating that Tinsley ever requested a CPAP machine or medical treatment for obstructive sleep apnea during his discussions with Jackson.[60]

Corizon's services were limited to providing on-site medical and dental services

---

[55] Doc. no. 51-5 (Poursaied Affidavit), ¶ 3.

[56] *Id.*, ¶ 5.

[57] Doc. no. 50 (Defendants' Brief), ¶ 10.

[58] *Id.*, ¶ 11; *see* doc. no. 51-7 (McElroy Affidavit), ¶ 7.

[59] Doc. no. 50 (Defendants' Brief), ¶ 26.

[60] Doc. no. 51-7 (McElroy Affidavit), ¶ 8.

within the State's prison facilities.[61]    The Alabama Department of Corrections separately

contracted with Mental Health Management, Inc. ("MHM"), an entity unrelated to

Corizon, to provide mental health services to State inmates.[62]    Corizon did not supervise,

manage, or control MHM's employees, or their delivery of mental health services.[63]

Even so, records of MHM's diagnoses and treatments are contained within the "jacket"

containing each inmate's health care records and, thus, were available for review by

Corizon's medical staff.[64]

Mark Tinsley visited a member of MHM's mental health staff on a monthly basis

for treatment of post-traumatic stress disorder.[65]    That company's records indicate that

he began to request a CPAP machine shortly after arriving at Limestone.[66]    His

psychiatric progress notes record that he discussed his need for (and/or requested) a

CPAP machine on five occasions during an eight-month period beginning on November

---

[61] Doc. no. 51-1 (Hood Affidavit), ¶¶ 4, 5.

[62] *Id.*, ¶ 5.

[63] *Id.*

[64] Doc. no. 66 (Plaintiff's Brief), at 7 (¶6). Natasha Lopez testified that she could not recall ever having had a reason to review an inmate's mental health records. Doc. no. 52-1 (Lopez Affidavit), ¶ 11.

[65] Doc. no. 50 (Defendants' Brief), ¶ 30; doc. no. 51-1 (Hood Affidavit), ¶ 30.

[66] Doc. no. 51-1 (Hood Affidavit), ¶ 30; doc. no. 68-7 (Tinsley's Psychiatric Progress Notes), at ECF 6 ("Reports hx of 'fighting in my sleep' and also that he was on CPAP for OSA . . . Records not found."). Tinsley's Jan. 23, 2013 mental health services progress notes state: "Today is a good day. Inmate signal [*sic*] authorization of release for sleep study information. Inmate reports he is not sleeping well without his CPAP machine. Inmate reports he hasn't had his machine since [he was incarcerated at] Kilby." *Id.* at ECF 8 (alterations supplied).

28, 2012, and ending on August 2nd of the following year.[67]  On that last date, August 2,

2013, Michelle Pratt, a member of MHM's staff, completed a "Referral to Medical

Services" form requesting that Corizon medical staff evaluate Tinsley for CPAP

therapy.[68]  Shahla Poursaied acknowledged receipt of the referral form; and, five days

later, on August 7, 2013, she entered an order enrolling Tinsley in the Chronic Care

program.  She also scheduled him to be seen by Dr. Randall Stubbs for evaluation of

obstructive sleep apnea.[69]  Even so, Poursaied testified that she *personally* did not see

or treat Tinsley.[70]  Instead, her functions were limited to enrolling him in the Chronic

Care program, and referring him to Dr. Stubbs for further evaluation.[71]

Dr. Stubbs met with Tinsley the following week.  After locating Tinsley's personal

CPAP machine (which apparently had been transferred from the Jefferson County Jail

to Limestone Correctional Facility),[72] Dr. Stubbs contacted Captain Guy Noe, a

correctional officer assigned to E-Dorm, to arrange for Tinsley to be moved to a cell

with an electrical outlet.[73]  Captain Noe in turn arranged for Mark Tinsley and his

---

[67] Doc. no. 51-1 (Hood Affidavit), ¶ 30.  *See* doc. no. 68-7 (Mental Health Services Records), at ECF 1-11.

[68] Doc. no. 51-1 (Hood Affidavit), ¶ 30; doc. no. 51-5 (Poursaied Affidavit), ¶ 11; doc. no. 68-7 (Mental Health Services Records), at ECF 2.

[69] Doc. no. 51-5 (Poursaied Affidavit), ¶¶ 13-15.

[70] *Id.*, ¶ 7.

[71] *Id.*, ¶¶ 13-15.

[72] *See supra* notes 29-30 and accompanying text.

[73] Dr. Stubbs entered the following notations in Mark Tinsley's medical records: "CPAP machine 17608 . . . states has had machine [approximately] 8 years . . . used 339/745 days . . . use

cellmate, Randy Sandlin, to be moved on September 6, 2013 from cell E11 (which did

not have an electrical outlet) to cell E1 (which did). Mark Tinsley thereafter used his

CPAP machine on a regular basis.[74]

However, Mark Tinsley refused an annual flu vaccination one month later, on

October 10, 2013.[75] Eighteen days later, on Monday, October 28, 2013, he began to

exhibit signs of illness, including sinus drainage and a headache.[76] During pill call the

following day, Tuesday, October 29, 2013, Tinsley told Natasha Lopez that he was

suffering from cold-like symptoms.[77] After observing Tinsley, Lopez arranged for him

to be evaluated the following Wednesday morning by Certified Registered Nurse

Practitioner Charles Hooper. Hooper noted that Tinsley had a slightly elevated body

temperature of 99 degrees, but his "lungs were clear."[78] Hooper diagnosed Tinsley as

suffering from an upper respiratory infection and allergies, and prescribed Zyrtec,

---

[decreased] when incarcerated . . . [Discussed with] Capt. Noe — will try to arrange for cell [with] plug — we have personal machine here from which I got . . . data." Doc. no. 51-4 (Tinsley Medical Records), at ECF 32 (ellipses and alterations supplied).

[74] Doc. no. 52-6 (Sandlin Affidavit), ¶ 6. Even so, it should be noted that Mark Tinsley did not receive formal paperwork allowing continued possession of his CPAP machine until Certified Registered Nurse Practitioner Charles Hooper issued a "special needs communication form" on October 23, 2013. See doc. no. 68-7 (Special Needs Communication Form), at ECF 9; doc. no. 51-1 (Hood Affidavit), ¶ 36. Dr. Hood testified that the delay in receiving a special needs communication form is a common occurrence. The form is required only as a formal means of showing that an inmate has permission to have continued access to the equipment or items listed on the form.

[75] Doc. no. 51-1 (Hood Affidavit), ¶ 35.

[76] Doc. no. 50 (Defendants' Brief), ¶ 40.

[77] Doc. no. 52-1 (Lopez Affidavit), ¶ 15.

[78] Doc. no. 50 (Defendants' Brief), ¶ 43.

Guaifenesin (an oral decongestant), and Tylenol to alleviate his symptoms.[79]

On Thursday, October 31, 2013 — the day after Tinsley's evaluation by Charles Hooper — Natasha Lopez again conducted pill call in E-Dorm. She testified that when Tinsley received his medications, including those he had been prescribed by Charles Hooper the previous day, he did not appear to be in physical distress, and he did not request additional medical attention.[80]

Tinsley attended an appointment with a member of MHM's mental health staff at 11:15 a.m. on the following day, Friday, November 1, 2013.[81] MHM records show that, during that meeting, Tinsley stated that he had been sick over the course of the preceding week. Even so, the MHM staff member recorded that Tinsley was in a good mood, laughing, and appeared well groomed.[82]

Nevertheless, just two days later, and during the early-evening hours of Sunday, November 3, 2013, Mark Tinsley reported to the correctional officers on duty in E-Dorm that he was feeling very ill, was short of breath, and was coughing up blood.[83] The

_____

[79] Doc. no. 51-1 (Hood Affidavit), ¶ 38.

[80] Doc. no. 50 (Defendants' Brief), ¶ 44; doc. no. 52-1 (Lopez Affidavit), ¶ 16.

[81] Doc. no. 50 (Defendants' Brief), ¶ 45.

[82] Id.; doc. no. 51-1 (Hood Affidavit), ¶ 39.

[83] Dwayne Spradlin, an inmate housed in E-Dorm, testified that there were "several occasions" between the dates of October 28 and November 3, 2013, when both he and Mark Tinsley petitioned the E-Dorm guards to request medical treatment for Tinsley. Doc. no. 52-4 (Spradlin Deposition), at 113-14. Randy Sandlin, Mark Tinsley's cell mate, recalls that Tinsley submitted two sick calls around the time he began to become ill, but does not recall Tinsley going to the Heath Care Unit before November 3, 2013. Doc. no. 52-6 (Sandlin Affidavit), ¶ 7. Even so, there are no sick call requests

officers notified Corizon health care staff of Tinsley's complaints, and were instructed to escort him directly to the Health Care Unit.[84]

Nurse Susan Mullin performed a physical examination and took Mark Tinsley's vital signs when he arrived in the Health Care Unit at 7:15 p.m.[85] She noted that, even though Tinsley's nose was running and his lung sounds were diminished, he did not appear to be in acute distress, and he was not clammy, pale, or congested.[86] She recorded that Tinsley's blood pressure and pulse were normal, and his blood oxygen saturation level was 86% (and rose to 92% following a breathing treatment).[87] The "Nursing Encounter Tool" form used to document Mullin's examination findings recorded Tinsley's chief complaints as spitting up blood and not eating for four days. Even so, Mullin recorded that she *personally* had not observed "rust tinged sputum."[88]

Natasha Lopez was present in the Health Care Unit when Tinsley was escorted there. She testified that, even though Tinsley "clearly was not feeling well, he was not experiencing a medical emergency nor did he appear in any acute distress."[89] She added

---

documenting the "several requests," other than those that are discussed in the body of this opinion.

[84] Doc. no. 50 (Defendants' Brief), ¶ 46.

[85] Doc. no. 51-1 (Hood Affidavit), ¶ 40.

[86] *Id.*, ¶ 41.

[87] Doc. no. 50 (Defendants' Brief), ¶ 50.

[88] Doc. no. 51-4 (Nursing Encounter Tool: Upper Respiratory Symptoms), at ECF 33.

[89] Doc. no. 52-1 (Lopez Affidavit), ¶ 18.

that he was able to "walk and communicate with me."[90]

An undisclosed member of Corizon's nursing staff contacted Dr. Crocker, a Corizon physician who was "on call."[91]  He ordered that Tinsley be admitted to Limestone's on-site infirmary (an emergency care facility), and directed "respiratory treatments every four hours . . . multiple tests for infection of the lungs, including a complete blood count, blood cultured times two, sputum and urine cultures and a chest x-ray."[92]  He also directed that Tinsley be placed on oxygen, and his symptoms treated with antibiotics and steroids.

Dr. Hugh Hood subsequently evaluated Tinsley's lab test results and chest x-rays. He believed that Tinsley was not "showing any signs or symptoms of respiratory distress sufficient to warrant hospitalization or off-site acute care."[93]  Tinsley's medical records indicate that the initial diagnosis upon his admission to Limestone's on-site infirmary was "early pneumonia."[94]  His condition was monitored by the infirmary's nursing staff over the following two days, and their observations of his vital signs were recorded at

---

[90] *Id.*

[91] Doc. no. 50 (Defendants' Brief), ¶ 51; doc. no. 51-1 (Hood Affidavit), ¶ 43; doc. no. 52-7 (Mullin Deposition), at 111-12.

[92] Doc. no. 50 (Defendants' Brief), ¶ 51 (ellipsis supplied); *see also* doc. no. 51-1 (Hood Affidavit), ¶ 43.

[93] Doc. no. 51-1 (Hood Affidavit), ¶ 44.

[94] Doc. no. 51-4 (Tinsley Medical Records), at ECF 66.

least three times each day.[95]

Mark Tinsley voiced no complaints during his evaluation on the afternoon of Monday, November 4, 2013: the day following his admission to the on-site infirmary. His oxygen saturation remained fairly steady throughout that day, registering 96% that morning and 92% in the evening.[96] A radiology report generated on the same date depicted a "basilar atelectasis" of his left lung,[97] but his lungs otherwise were well inflated.[98]

Mark Tinsley again voiced no complaints on Tuesday, November 5, 2013, the second day following his admission to Limestone's on-site infirmary. Instead, he said that he felt "alright" [*sic*]. He then was receiving three liters of oxygen, and his blood oxygen saturation level was recorded as 90% at 3:00 p.m.[99] Medical records also indicate that, eight hours later (11:00 p.m.), he again voiced no complaints, exhibited no swelling, and his blood oxygen saturation level was 91%.[100] After that, however, Mark Tinsley's condition deteriorated rapidly.

---

[95] Doc. no. 50 (Defendants' Brief), ¶ 53; *see* doc. no. 51-4 (Tinsley Medical Records), at ECF 64-66.

[96] Doc. no. 50 (Defendants' Brief), ¶ 54; *see* doc. no. 51-4 (Tinsley Medical Records), at ECF 65.

[97] *Basilar* refers to the base or basal part of an organ, and *atelectasis* refers to an "incomplete expansion of a lung or portion of a lung." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 204 and 171, respectively (30th ed. 2003).

[98] Doc. no. 51-4 (Nov. 4, 2013 Radiology Report), at ECF 59.

[99] Doc. no. 50 (Defendants' Brief), ¶ 55.

[100] Doc. no. 51-4 (Tinsley Medical Records), at ECF 65-66.

By 1:30 a.m. during the early-morning hours of Wednesday, November 6, 2013, the third day following Tinsley's admission to Limestone's on-site infirmary, he was short of breath and his oxygen saturation level had dropped precipitously, to 49%.[101] Dr. Crocker ordered Tinsley to be immediately transferred by ambulance to Crestwood Medical Center in Huntsville, Alabama:[102] a 180-bed, full-service, acute care hospital.[103]

When Tinsley arrived in Crestwood's emergency room at 3:04 a.m. that morning,[104] he reported shortness of breath, and stated that he had "started feeling bad on Wednesday [*of the previous week, October 30th*[105]]."[106] The hospital staff recorded that he "was alert, awake, oriented to time[,] place, person[,] and situation, cooperative, his speech was normal, he was comfortable, pain free[,] and in no apparent distress."[107] He was monitored regularly for the next several hours, but his condition continued to decline.[108]

---

[101] *See id.* at ECF 65.

[102] Doc. no. 50 (Defendants' Brief), ¶ 57; doc. no. 51-4 (Tinsley Medical Records), at ECF 65-66; doc. no. 51-1 (Hood Affidavit), ¶ 49.

[103] *See* http://www.crestwoodmedcenter.com/crestwood-medical-center/aboutus.aspx (*last visited* June 26, 2017).

[104] Doc. no. 53-1 (Crestwood Medical Center Records), at ECF 9.

[105] Wednesday, October 30, 2013, was the date on which Tinsley had been examined by Certified Registered Nurse Practitioner Charles Hooper. *See supra* notes 76-77 and accompanying text.

[106] Doc. no. 53-1 (Crestwood Medical Center Records), at ECF 9 (alteration supplied).

[107] Doc. no. 50 (Defendants' Brief), ¶ 59 (alterations supplied).

[108] Doc. no. 53-1 (Crestwood Medical Center Records), at ECF 10-22.

"Mr. Tinsley was intubated[109] and, over the course of several days, evaluated by multiple specialists, including pulmonary critical care, cardiology and infectious disease."[110]   Despite the fact that multiple samples of his blood, sputum, and urine were taken and cultured, none showed any sign of infection.

The hospital staff initially diagnosed Tinsley's lung condition as a noncardiogenic pulmonary edema:   "a term used to describe the changes seen in acute respiratory distress syndrome ('ARDS')."[111]   He ultimately was diagnosed as suffering from ARDS. Despite more than nine days of aggressive treatment, his respiratory function continued to decline.[112]

Mark Tinsley died on Friday, November 15, 2013, nine days following his admission to Crestwood Medical Center, and after he had developed a bradycardic rhythm,[113] from which he could not be resuscitated.[114]   The final entry in his Crestwood medical record reflects the primary cause of death as "[c]ardiopulmonary arrest with secondary cause being respiratory failure secondary to [acute respiratory distress

---

[109] *Intubation* refers to "the insertion of a tube into a body canal or cavity . . ." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 947 (30th ed. 2003) (ellipsis supplied).

[110] Doc. no. 50 (Defendants' Brief), ¶ 60 (footnote supplied).

[111] Doc. no. 53-3 (Lynne Affidavit), ¶ 40.

[112] Doc. no. 50 (Defendants' Brief), ¶ 61.

[113] *Bradycardia* is a term that refers to a "slowness of the [rhythm of the] heartbeat, as evidenced by slowing of the pulse rate to less than 60." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 246 (30th ed. 2003) (alteration supplied).

[114] Doc. no. 50 (Defendants' Brief), ¶ 62.

syndrome], obstructive sleep apnea, hypertension, asthma, atrial fibrillation, bilateral pneumonia, and sepsis."[115]   An autopsy revealed "diffuse alveolar damage of unknown etiology in the lungs (consistent with the clinical history of acute respiratory distress syndrome). . . . The clinical history and autopsy findings support the cause of death to be acute respiratory failure in the setting of acute respiratory distress syndrome."[116]

## IV. DISCUSSION

As noted above, Mark Tinsley died on November 15, 2013.  Miranda Waites's complaint was filed nearly one year later, on November 11, 2014.  That presents a problem because neither the common law of the United States nor that of England, from whence our legal principles evolved, allows a cause of action by one person to recover damages for wrongfully inflicted injuries that result in the death of another person.[117]  Rather, all such remedies are strictly the product of statutes.[118]   In that regard, plaintiff

---

[115] Doc. no. 53-1 (Crestwood Medical Center Records), at ECF 23 (alterations supplied).

[116] Doc. no. 53-2 (UAB Autopsy Report), at ECF 19 (ellipsis supplied).

[117] *See, e.g.*, *Panama Railroad Co. v. Rock*, 266 U.S. 209, 211 (1924) ("It is settled that at common law no private cause of action arises from the death of a human being.  The right of action, both in this country and in England, depends wholly upon statutory authority.") (citations omitted); *The Harrisburg v. Rickards*, 119 U.S. 199, 205 (1886) ("It is a singular fact that by the common law the greatest injury which one man can inflict on another, the taking of his life, is without a private remedy.").  The origin of the maxim that *no action for wrongful death was known to the common law* is lost in the obscurity of time, but some answers were suggested by Professor Wex S. Malone in his article *The Genesis of Wrongful Death*, 17 Stan. L. Rev. 1043 (1965).

[118] *See, e.g.*, William L. Prosser, Handbook of the Law of Torts §§ 126-127 (4th ed. 1971); Jenelle Mims Marsh, Alabama Law of Damages § 37:1 (2012).

based her claims upon 42 U.S.C. §§ 1983 and 1988. *See* doc. no. 1 (Complaint), ¶ 3.[119]

Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, *shall be liable to the party injured* in an action at law, suit in equity, or other proper proceeding for redress, except that in any action against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis supplied).[120]    The phrase "shall be liable to the party injured" serves to emphasize that an action under § 1983 "is personal to the injured party." *Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1047 (11th Cir. 2011). Here, the "party injured" by the defendants was Mark Tinsley, deceased, and a significant legal problem arises from the fact that 42 U.S.C. § 1983 does not specifically state that

---

[119] The cited paragraph states: "The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, and 1343(a)(3), (4) to obtain redress for deprivation of rights guaranteed by *the Fourth* and Fourteenth Amendments to the Constitution of the United States *pursuant to 42 U.S.C. §§ 1983 and 1988.*" Doc. no. 1 (Complaint), ¶ 3 (emphasis supplied). Plaintiff's choice of the *Fourth Amendment* (addressing search, seizure, and warrant requirements) as a constitutional basis for her claims is extraordinarily curious. The *Eighth Amendment* is the proper foundation, as underscored by *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), holding that a state official's deliberate indifference to the serious medical needs of a prisoner is cruel and unusual punishment under that Amendment. *Compare* doc. no. 1 (Complaint), ¶¶ 51-56 ("Count I — Eighth Amendment - Deliberate Indifference to Medical Needs and Treatment").

[120] Two important policies are supported by the statute: "compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." *Robertson v. Wegmann*, 436 U.S. 584, 590-91 (1978).

a person who sues in a representative capacity (*e.g.*, as administratrix of another person's estate) may base an action upon that statute to recover damages for the alleged wrongful killing of the administratrix's decedent by persons acting under color of state law. *Cf. Estate of Gilliam*, 639 F.3d at 1043 ("No language in 42 U.S.C. § 1983 provides for the survival of a civil rights action in favor of another upon the death of the injured party.").[121]

Moreover, the Supreme Court has not resolved the question of whether a wrongful death claim may be maintained under 42 U.S.C. § 1983.[122] There also is considerable disagreement among the Circuits on the issue of whether one person may bring an action under § 1983 to recover damages for injuries that are wrongfully inflicted under color

---

[121] The opinion in *Estate of Gilliam* addressed an issue that is closely related to, but nevertheless distinct from, the question discussed in this opinion: *i.e.*,

> The issue in this case [*Estate of Gilliam*] is whether a § 1983 excessive force claim survives in Alabama if the injured party dies before the lawsuit is filed, or abates pursuant to Ala. Code § 6-5-462 [the state's survival statute]. *We stress at the outset that this case, in its present procedural posture, does not involve a claim that the officers' unconstitutional conduct caused the decedent's death.* The state law wrongful death claims under Ala. Code § 6-5-410, and the § 1983 excessive force claims alleging that death was the result of the use of force, were both dismissed at the summary judgment stage because the Estate produced no admissible evidence that the officers' use of force caused the decedent's death. *Therefore, the only issue we address is whether a § 1983 excessive force claim that did not result in the decedent's death survives in Alabama or abates under Ala. Code § 6-5-462.*

639 F.3d at 1044-45 (alterations and emphasis supplied, footnote omitted).

[122] *See, e.g.*, 1B Martin A. Schwartz, SECTION 1983 LITIGATION: CLAIMS AND DEFENSES § 13.03[A] & n.60 (4th ed. 2014) (2017 Supp.); Steven H. Steinglass, *Wrongful Death Actions and Section 1983*, 60 Ind. L.J. 559, 565, 587 (1985).

of state law upon another person, and which result in the death of that other person. *See, e.g., Carringer v. Rodgers*, 331 F.3d 844, 850 n.9 (11th Cir. 2003) (collecting cases and observing that the "right to wrongful death recovery under § 1983 has generated considerable debate amongst our sister circuits").[123]

---

[123] The full text of footnote number 9 in the *Carringer* opinion reads as follows:

The right to wrongful death recovery under § 1983 has generated considerable debate amongst our sister circuits. In fact, there are at least four different theories used by circuit courts to determine what claims after death may proceed under § 1983. *See* 1C Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation Claims and Defenses* §§ 13.3–13.7 (3d ed. 1997 & Supp. 2002) (discussing the two main theories and collecting cases). For example, [the former Fifth Circuit's opinion in *Brazier v. Cherry*, 293 F.2d 401 (5th Cir. 1961)] states that § 1988 permits courts to "borrow" state wrongful death statutes to the extent they are consistent with § 1983. *Brazier*, 293 F.2d at 409. Some circuits follow a constitutional approach; that is, to allow a claimant to argue that he had a relationship with the deceased that was constitutionally protected and that the homicide of the decedent destroyed that relationship and, therefore, violated the claimant's own protected constitutional rights. *See, e.g., Bell v. City of Milwaukee*, 746 F.2d 1205, 1242–48 (7th Cir. 1984) (parent may assert constitutional claim for death of adult child, but siblings cannot sue under wrongful death theory); *Trujillo v. Bd. of County Comm.*, 768 F.2d 1186, 1189 (10th Cir. 1985) (recognizing constitutional claims by parents and siblings, but only when defendant intended to destroy constitutionally protected relationship). Other circuits have concluded that a parent does not have a liberty interest in the companionship of an adult child. *See, e.g., Butera v. District of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001). Still, some circuits permit recovery of the damages for the harm done to the decedent, but not for the harm to the survivor, even though both are permitted under state law. *See, e.g., Andrews v. Neer*, 253 F.3d 1052, 1063–64 (8th Cir. 2001) (*en banc*). However, until the Supreme Court elects to decide the issue or this Court, sitting *en banc*, overrules *Brazier*, we are bound by *Brazier's* decision that under § 1988 Georgia's wrongful death statute is incorporated into § 1983. *Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997) ("The law of this circuit is 'emphatic' that only the Supreme Court or this court sitting *en banc* can judicially overrule a prior panel decision."). Although the Supreme Court has addressed § 1983 actions after death in two potentially relevant cases, *see Moor v. County of Alameda*, 411 U.S. 693, 93 S. Ct. 1785, 36 L. Ed. 2d 596 (1973) and *Robertson v. Wegmann*, 436 U.S. 584, 98 S. Ct. 1991, 56 L. Ed. 2d 554 (1978), it has not reached the issue raised and decided in *Brazier*. In fact, the Supreme Court cited to *Brazier* as an example of the type of

Even so, that question was answered by binding precedent in *Brazier v. Cherry*, 293 F.2d 401 (5th Cir. 1961) (Brown, J., majority opinion).[124]   The plaintiff in *Brazier* was the widow and personal representative of the estate of a man who died as the result of a brutal, racially-motivated beating by police following an illegal arrest.   The district court dismissed the suit.[125]   The former Fifth Circuit reversed, and in doing so viewed the omission of language in § 1983 explicitly permitting an action by one person to recover damages for injuries wrongfully inflicted upon another person under color of state law, and which caused the death of that other person, to be a "gap" in federal law.   *See, e.g.*, *Brazier*, 293 F.2d at 407 (noting the statutory "gap" between "the historical major aim of the civil rights legislation" enacted in the wake of the Civil War, and, "the tolerant, hospitable construction to ameliorate the hardships of the common law rule" against actions for wrongful death).

The *Brazier* court filled that "gap" by utilizing the "deficiency clause" of 42 U.S.C.

---

issue it was not addressing.  *See Robertson*, 436 U.S. at 594, 98 S. Ct. 1991.

*Carringer v. Rodgers*, 331 F.3d 844, 850 n.9 (11th Cir. 2003) (alteration supplied).  *See also, e.g.*, Martin A. Schwartz, *supra* note 119 at § 13.03[A] & n.58.

[124] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.  *See also Carringer*, 331 F.3d at 848 (describing the textual question as having been "answered by binding precedent in *Brazier v. Cherry*"); *id*. at 850 n.9 (holding that, "until the Supreme Court elects to decide the issue or this Court, sitting *en banc*, overrules *Brazier*, we are bound by *Brazier's* decision that under § 1988 Georgia's wrongful death statute is incorporated into § 1983") (citation omitted).

[125] *Brazier v. Cherry*, 188 F. Supp. 817, 819 (M.D. Ga. 1960).

§ 1988, which requires courts hearing civil rights actions to follow the laws of the various states, *except when* those laws "are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law." Specifically, the relevant part of § 1988 provides that:

> The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; *but in all cases where they* are not adapted to the object, or *are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held*, so far as the same is not inconsistent with the Constitution and laws of the United States, *shall be extended to and govern the said courts in the trial and disposition of the cause*, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

42 U.S.C. § 1988(a) (emphasis supplied).

In other words, when federal law is "deficient," § 1988(a) requires federal courts to follow the "common law, as modified and changed" by the law of the state in which the court is sitting. For that reason, the Fifth Circuit borrowed Georgia's wrongful death statute to allow a remedy when injuries inflicted under color of state law resulted in the death of the § 1983 plaintiff's decedent. *See, e.g., Brazier*, 293 F.2d at 408-09 (concluding that the adoption of the state wrongful death statute under the authority of § 1988(a) assures that there will be a remedy when a violation of the civil rights

35

protected by § 1983 resulted in the death of the injured person). *See also*, *e.g.*, *Carringer*, 331 F.3d at 849 (construing *Brazier* as holding that § 1988(a) incorporated Georgia's wrongful death statute) (footnote omitted).[126]

Several cases have held in the context of suits commenced by the personal representative of a decedent's estate, and alleging that constitutional violations under color of Alabama law caused the death of the plaintiff's decedent, that a § 1983 claim asserted through § 1988(a) "incorporates" Alabama's wrongful death statute for the purpose of claiming damages from the state actors responsible for the death. *See*, *e.g.*, *Estate of Gilliam*, 639 F.3d at 1047 (Cox, J.) (observing that, "when a constitutional violation actually causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful death statute"); *id.* at 1047-48 (characterizing such a suit as "consistent with the purposes of § 1983") (footnotes omitted);[127] *Weeks v. Benton*, 649

---

[126] The omitted footnote in *Carringer* observed that its construction of *Brazier's* holding was

consistent with the current Fifth Circuit's reading of the decision. *See Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996) (stating "it is the law of this circuit that individuals who are within the class of people entitled to recover under Texas's wrongful death statute have standing to sue under § 1983"); *Rhyne* [*v. Henderson County*, 973 F.2d 386, 391 (5th Cir. 1992)] (concluding that § 1988 incorporates Texas's wrongful death statute and that a plaintiff parent may recover "for her injury caused by the state's deprivation of her son's constitutionally secured liberty interests").

*Carringer*, 331 F.3d at 849 n.6 (alteration supplied).

[127] One of the omitted footnotes observed, in pertinent part, that: "Clearly, if a state actor could escape § 1983 liability by killing off the victim, then the deterrent purposes of the statute would no longer exist. But Alabama law does not pose this problem because the wrongful death statute, Ala. Code § 6-5-410, provides for recovery when unconstitutional conduct causes death." *Estate of Gilliam*, 639 F.3d at 1048 n.10.

F. Supp. 1297, 1303 (S.D. Ala. 1986) (Hand, C.J.) ("State survival statutes and wrongful death statutes have been consistently applied through § 1988 to actions under § 1983."); *Brown v. Morgan County*, 518 F. Supp. 661, 664-65 (N.D. Ala. 1981) (Propst, J.) (holding that the policies of the Alabama wrongful death act are consistent with those of the federal civil rights statutes, and that the state act may be adopted in a § 1983 action through § 1988); *James v. Murphy*, 392 F. Supp. 641, 645 (M.D. Ala. 1975) (Varner, J.) (allowing widow to assert a § 1983 wrongful death claim by incorporating the Alabama wrongful death statute through § 1988); *Pollard v. United States*, 384 F. Supp. 304 (M.D. Ala. 1974) (Johnson, J.) (same); *see also, e.g.*, *Bell v. Shelby County, Alabama*, No. 2:12-cv-2291-LSC, 2013 WL 2248247, at *13 (N.D. Ala. May 21, 2013) (Coogler, J.) (recognizing that the personal representative of a decedent's estate may utilize "§ 1988 and the Alabama wrongful death statute to create a § 1983 wrongful death claim") (citing *Estate of Gilliam*, 639 F.3d at 1047).

Alabama's wrongful death statute is codified at Alabama Code § 6-5-410, and the pertinent subsection provides that:

> (a) A personal representative may commence an action and recover such damages as the jury may assess in a court of competent jurisdiction within the State of Alabama where provided for in subsection (e), and not elsewhere, for the wrongful act, omission, or negligence of any person, persons, or corporation, his or her or their servants or agents, whereby the death of the testator or intestate was caused, provided the testator or intestate could have commenced an action for the wrongful act, omission, or negligence if it had not caused death.

Ala. Code. § 6-5-410(a) (1975) (2014 Replacement Vol.).

## A.    Count I — Eighth Amendment - Deliberate Indifference to Medical Needs and Treatment

In summary, Count I of the complaint asserts a wrongful death claim based upon Ala. Code § 6-5-410 asserted through 42 U.S.C. § 1983 and § 1988(a) against the individual defendants employed by Corizon Medical Services, LLC, for deliberate indifference to the serious medical needs of Mark Tinsley — a dereliction of a constitutional duty that, plaintiff contends, was the proximate cause of her father's death.

Deliberate indifference to a state prisoner's serious medical needs is a violation of a constitutional duty imposed by the Eighth and Fourteenth Amendments. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).[128]    As the Eleventh Circuit observed in *Marsh v. Butler County*, 268 F.3d 1014 (11th Cir. 2001) (*en banc*), the Supreme Court's opinion in *Estelle*

---

[128] *See also*, *e.g.*, *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."); *DeShaney v. Winnebago County Deptartment of Social Services*, 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.") (alteration supplied); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (observing that *Estelle's* conclusion that "deliberate indifference to an inmate's medical needs is cruel and unusual punishment rested on the fact, recognized by common law and legislatures, that 'an inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met'") (quoting *Estelle*, 429 U.S. at 290); *Carlson v. Green*, 446 U.S. 14 (1979) (holding that a state, county, or municipal official's deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth and Fourteenth Amendments, and is actionable under 42 U.S.C. § 1983).

interpreted the Eighth Amendment's words against "cruel and unusual punishments," and, for the first time, determined that governments — presented with an inmate with a serious medical condition — had an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 97 S. Ct. at 290. The Court reasoned that, "[a]n inmate must rely on prison authorities to treat his medical needs; if authorities fail to do so, those needs will not be met." *Id*. Under *Estelle*, the critical fact supporting the obligation on the government is the fact of incarceration: the prisoner cannot get his own care, nor can anyone from outside the jail get to him to help him.

*Marsh*, 268 F.3d at 1038 (alteration in original). To prove her claim of deliberate indifference, plaintiff must establish that: her father had a serious medical need; at least one of the remaining defendants was deliberately indifferent to that need; and, there is a causal linkage between the indifference and her father's death. *See, e.g., Mann v. Taser International, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).[129]

The term *serious medical need* has been defined as a condition that *either* has been diagnosed by a physician as mandating treatment, *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, *and* a condition that, if left unattended, posed a substantial risk of serious harm. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (citing, *e.g., Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000); *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1187 (11th Cir. 1994)).

---

[129] *See also, e.g., Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) ("Ultimately, there are . . . four requirements: an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts.") (ellipsis supplied).

To establish the *deliberate indifference* element, plaintiff must show (1) a defendant's subjective knowledge of a risk of serious harm to her father if the serious medical need was not addressed, and (2) disregard of that risk (3) by conduct that is "more than gross negligence." *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010).

The *subjective knowledge* component requires plaintiff to show that a defendant was *both* aware of facts from which an inference reasonably could be drawn that a substantial risk of serious harm existed, *and* that the defendant actually drew the inference. *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005). "No liability arises for 'an official's failure to alleviate a significant risk that he should have perceived but did not.'" *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 825 (1994)).

When attempting to determine whether a delay in treatment rose to the level of "deliberate indifference," in the sense that a defendant *subjectively possessed* a "sufficiently culpable state of mind"[130] — *i.e.*, that the defendant's actions or omissions constituted "more than gross negligence" — relevant factors for consideration include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee County*, 510 F.3d 1312,

---

[130] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

40

1327 (11th Cir. 2007).

Furthermore, a defendant's response to indications that a prisoner may need medical attention must have been "poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnosi[s] or treat[ment],' or even '[m]edical malpractice' actionable under state law." *Taylor v. Adams*, 221 F.3d at 1258 (alterations in original) (quoting *Estelle*, 429 U.S. at 105-06).

Each element of plaintiff's deliberate indifference claim is examined in the following subsections.

1.    **Serious medical needs**

*Obstructive sleep apnea* is a condition that satisfies the definition of a "serious medical need." *See, e.g.*, *Meloy v. Bachmeier*, 302 F.3d 845, 848-849 (8th Cir. 2002) (recognizing obstructive sleep apnea as a serious medical need); *Allah v. Gramiak*, No. 5:13-cv-186, 2015 WL 269478, at *4 (M.D. Ga. Jan. 21, 2015) ("This accords with the observations of courts that have considered the issue and found sleep apnea to be a dangerous medical condition.") (citing *Howard v. Goord*, No. 98-cv-7471, 2001 WL 739244, at *2 (E.D. N.Y. June 6, 2001)). The parties' experts agreed that obstructive sleep apnea, if left untreated, can produce increased risks for serious harm.[131]

---

[131] *See* doc. no. 53-5 (Deposition of Marvin Pietruszka, M.D.), at 19; doc. no. 68-2 (Deposition of Jack Hanson, M.D.), at 41.

*Asthma* has been recognized by the Eleventh Circuit as a serious medical need. *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). The Seventh Circuit held that, "[a]s a general matter, asthma 'can be, and frequently is, a serious medical condition, depending on the severity of the attacks.'" *Lee v. Young*, 533 F.3d 505, 510 (7th Cir. 2008) (quoting *Board v. Farnham*, 394 F.3d 469, 484 (7th Cir. 2005)) (alteration supplied); *see also Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (observing that asthma, "depending upon its degree, can be a serious medical condition"). The Sixth Circuit also recognized asthma as a potentially serious medical need. *Harrison v. Ash*, 539 F.3d 510, 518-19 (6th Cir. 2008). Plaintiff's expert testified, and defendants conceded, that untreated asthma can "lead to respiratory distress where people go into wheezing, shortness of breath, and usually respiratory failure."[132] Defendant Shahla Poursaied testified that, in her opinion, untreated asthma could result in severe respiratory problems.[133] Construing the facts in a light most favorable to plaintiff, one could conclude that Mark Tinsley's late October to early November symptoms were consistent with those that occur as the consequence of a complication of asthma — *i.e.*, shortness of breath and wheezing. Those symptoms, coupled with Crestwood Medical Center's discharge records indicating that asthma was among Mark Tinsley's causes of

---

[132] *See* doc. no. 68-2 (Deposition of Jack Hanson, M.D.), at 156; doc. no. 66 (Plaintiff's Responsive Brief), ¶ 29.

[133] Doc. no. 51-6 (Poursaied Deposition), at 114.

42

death, are sufficient to show a serious medical need.

*Pneumonia* unquestionably is a serious medical need, and it is not disputed that Mark Tinsley's pneumonia developed into acute respiratory distress syndrome (ARDS) and culminated in his death.

### 2.     Deliberate indifference

Plaintiff cannot prove that any of the remaining, individual defendants demonstrated deliberate indifference to Mark Tinsley's serious medical needs. There is no evidence indicating that any of them disregarded a risk of serious harm, much less engaged in conduct that was more than gross negligence. There is no evidence indicating that Mark Tinsley was denied medical care.

Nevertheless, plaintiff asserts that, because defendants delayed in providing Mark Tinsley a CPAP machine and failed to treat his asthma, his lungs were damaged, thereby making him more susceptible to contracting the pneumonia that developed into the acute respiratory distress syndrome that ultimately caused his death.[134] Plaintiff contends that defendants should have reviewed the notes that were compiled by mental health personnel employed by Mental Health Management, Inc., and placed inside Tinsley's medical records jacket; and that, if they had done so, defendants would have discovered that Tinsley had discussed or requested a CPAP machine on five occasions during an eight-

---

[134] Doc. no. 66 (Plaintiff's Responsive Brief), at 17-22.

month period beginning on November 28, 2012.[135]   She also contends that a review of

Tinsley's medical records jacket would have revealed a copy of the UAB sleep study that

recommended continued use of a CPAP machine.[136]   Plaintiff also claims that defendants

should have enrolled Mark Tinsley in the Chronic Care Unit immediately following his

arrival at Limestone Correctional Facility.[137]   Finally, plaintiff asserts that, when Mark

Tinsley initially contracted pneumonia, the defendants' delay and alleged "malpractice"

in treating him constituted deliberate indifference to a serious medical need.[138]

### a.    Deliberate indifference to Tinsley's need for a CPAP machine

Plaintiff has failed to present sufficient evidence to show that Shahla Poursaied,

Rose Jackson, and/or Natasha Lopez possessed subjective knowledge of Mark Tinsley's

serious medical need for a CPAP machine and treatment for asthma, or that they engaged

in conduct amounting to deliberate indifference to those needs.

First, there is no evidence that Poursaied was subjectively aware of Tinsley's need

for a CPAP machine before August 2, 2013.   She testified that she never treated Mark

Tinsley, or saw him as a patient on any date.[139]   Poursaied's only dealings with Tinsley

---

[135] *See supra* note 66 and accompanying text.

[136] *See* doc. no. 66 (Plaintiff's Responsive Brief), at 23; *see also supra* note 29 (referencing the sleep study at UAB's Sleep/Wake Disorders Center during December of 2009, and citing doc. no. 68-11 (2009 UAB Sleep Study), at ECF 14-20).

[137] Doc. no. 66 (Plaintiff's Responsive Brief), at 23.

[138] *Id.* at 26-29.

[139] *Id.*

occurred when she issued an order enrolling him in the Chronic Care program, and scheduled him to see Dr. Stubbs for evaluation of his obstructive sleep apnea.[140]

It is clear that Poursaied received the August 2, 2013 "Referral to Medical Services" form authored by Michelle Pratt, a member of MHM's mental health staff, and requesting that Corizon medical staff evaluate Mark Tinsley for CPAP therapy.[141] The date on which Poursaied received that form, however, is not established by the evidence submitted to this court. Even so, it is not disputed that Poursaied entered an order enrolling Tinsley in the Chronic Care program on Wednesday of the following week, August 7, 2013. She simultaneously scheduled him to be seen by Dr. Randall Stubbs, and evaluated for obstructive sleep apnea.[142] The proximity of those acts do not demonstrate "deliberate indifference."

There is no evidence indicating that either of the Licensed Nurse Practitioners, Rose Jackson and Natasha Lopez, possessed a subjective awareness of Mark Tinsley's need for a CPAP machine. Of course, both nurses conducted pill calls and sick calls in E-Dorm on several occasions, and provided additional medical care to Tinsley during his incarceration. Even so, there is no evidence that he ever requested either nurse to

---

[140] Doc. no. 51-5 (Poursaied Affidavit), ¶¶ 13-15.

[141] Doc. no. 51-1 (Hood Affidavit), ¶ 30; doc. no. 51-5 (Poursaied Affidavit), ¶ 11; doc. no. 68-7 (Mental Health Services Records), at ECF 2.

[142] Doc. no. 51-5 (Poursaied Affidavit), ¶¶ 13-15. As previously noted, however, Shahla Poursaied testified that she never "saw or treated Mr. Tinsley as a patient"; instead, her functions were limited to referring him to Dr. Stubbs and enrolling him in the Chronic Care Unit. *Id.*, ¶¶ 7, 15.

provide him a CPAP machine or any other treatment for obstructive sleep apnea.[143]

Plaintiff additionally contends that defendants' failure to place Mark Tinsley in the Chronic Care Unit immediately upon his arrival at Limestone Correctional Facility on or about September 28, 2012, contributed to his death on November 15th of the following year. Certified Registered Nurse Practitioner Charles Hooper testified that Shahla Poursaied's duties included reviewing the medical jackets of each incoming inmate, identifying chronic conditions, and referring inmates with such conditions to the Chronic Care Unit.[144] Nurse Susan Mullin stated that it likewise was the duty of Licensed Nurse Practitioners like Natasha Lopez and Rose Jackson to review an incoming inmate's medical records, discuss the inmate's past medical history, and refer the inmate to the proper care clinic.[145] The medical history of Mark Tinsley that was compiled by some nurse during the "New Arrival Intake Screening" procedure at Kilby Correctional Facility (recording a history of hypertension, post-traumatic stress disorder, obstructive sleep apnea, supraventricular tachycardia, and asthma)[146] was contained within the medical jacket that accompanied Tinsley when he was transferred from Kilby to Limestone Correctional Facility. Plaintiff contends that Shahla Poursaied, Natasha Lopez, or Rose Jackson should have reviewed those intake records and immediately placed Mark Tinsley

---

[143] *See* doc. no. 51-7 (McElroy Affidavit), ¶ 8; doc. no. 52-1 (Lopez Affidavit), ¶ 12.

[144] Doc. no. 52-5 (Charles Hooper Deposition), at 88.

[145] Doc. no. 52-7 (Susan Mullin Deposition), at 30.

[146] *See supra* notes 34-36 and accompanying text.

in the Chronic Care Unit.

The weakness of that contention lies in the principle that defendants' liability cannot be predicated upon the knowledge of the registered nurse who compiled Mark Tinsley's medical history during the "New Arrival Intake Screening" procedure at Kilby Correctional Facility, and then recorded it in the jacket that accompanied him to Limestone Correctional Facility. Stated differently, the knowledge of Kilby intake personnel cannot be imputed to defendants Poursaied, Lopez, or Jackson. *See*, *e.g.*, *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (observing that "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference") (citations omitted). Instead, plaintiff must show that at least one of the named defendants possessed a subjective awareness (*i.e.*, *actual knowledge*) of one or more of the serious medical needs recorded in the medical intake records that accompanied Mark Tinsley to Limestone, and was deliberately indifferent to the risks posed by those needs. *See*, *e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 838 (1994) (holding that a prison official cannot be liable under the Eighth Amendment unless a plaintiff shows that "the official knows of and disregards an excessive risk to inmate health and safety"). In other words, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as" deliberate indifference. *Id.*; *see also*, *e.g.*, *Burnette*, 533 F.3d at 1331 ("No liability arises under

the Constitution for 'an official's failure to alleviate a significant risk that he should have perceived but did not . . .'") (quoting *Farmer*, 511 U.S. at 838 (ellipsis in original)); *Whiting v. Marathon County Sheriff's Dept.*, 382 F.3d 700, 704 (7th Cir. 2004) (observing that *Farmer* "foreclosed imputed knowledge as the basis for an Eighth Amendment claim of deliberate indifference").

There is no evidence that any of the remaining defendants was subjectively aware of Mark Tinsley's need for chronic care prior to August 2, 2013. Plaintiff has presented no evidence that Shahla Poursaied possessed a subjective awareness of Tinsley's condition of obstructive sleep apnea during his intake at Limestone, or that she participated in the intake process. Natasha Lopez testified that she was not employed at Limestone during Mark Tinsley's intake.[147] As such, she could not have been aware of his medical needs at that time. Similarly, there is no evidence that Rose Jackson was subjectively aware of Mark Tinsley's condition on the date of his intake, or that she participated (or should have participated) in the intake process.

There also is no evidence that any of the defendants read the *mental health* records of Mark Tinsley placed inside his medical records jacket, discovered his need for a CPAP machine, and then intentionally disregarded a substantial risk to his health by failing to provide him such a device. Natasha Lopez testified that she was neither shown,

---

[147] Doc. no. 52-1 (Lopez Affidavit), ¶ 10.

nor knew of any reason to review, Tinsley's *mental health* records. Instead, she was not even "aware of the existence of [those] records" until they were shown to her prior to the date on which she executed her affidavit.[148] *See Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (observing that the Supreme Court's decision in *Farmer* "squarely rejected the plaintiff's invitation to adopt a purely objective test for deliberate indifference, holding instead that there could be no liability 'unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference'") (quoting *Farmer*, 511 U.S. at 837).

In short, plaintiff failed to establish that defendants possessed a subjective awareness of Mark Tinsley's serious medical need for a CPAP machine.

### b. Deliberate indifference to Tinsley's asthma

Plaintiff has presented no evidence of the following assertions: *i.e.*, that Mark Tinsley requested treatment for asthma; that he was diagnosed as suffering from that condition during his incarceration; or that he was prescribed therapy for that condition.[149] In fact, plaintiff's own expert, Dr. Marvin Pietruszka, M.D., admitted that there was no

---

[148] *Id.*, ¶ 11 (alteration supplied).

[149] Mark Tinsley's Medical Records indicate that Norwood Clinic, the Alabama Department of Corrections, and Crestwood Medical Center reflected a history of asthma. Doc. no. 68-11 (Norwood Clinic Records), at ECF 7; doc. no. 68-6 (Kilby Records), at ECF 3; doc. no. 53-1 (Crestwood Medical Center Records), at ECF 23.

evidence indicating that Tinsley suffered from an active case of asthma during his incarceration at Limestone Correctional Facilty — only that his medical records indicated a "history" of that condition.[150]  Dr. Pietruszka also testified that it was "not unusual for a patient to have asthma for a period of many years and it become quiescent."[151]

There also is no evidence that any of the defendants were subjectively aware of Mark Tinsley's "history" of asthma.   There is no evidence that he exhibited asthmatic symptoms or requested medical treatment for asthma prior to developing symptoms that *possibly* were attributable to that condition on November 3, 2013.

### c.    Deliberate indifference to Tinsley's need for treatment during the period from late October to early November of 2013

Plaintiff contends that, when Mark Tinsley initially contracted pneumonia, the defendants' delay in obtaining appropriate treatment constituted deliberate indifference to his serious medical needs.[152]   However, there is no evidence indicating that Shahla Poursaied, Rose Jackson, or Natasha Lopez was subjectively aware that Mark Tinsley was at risk of serious harm if he did not receive additional or different treatment in the days leading up to his admission to the infirmary on November 3, 2013.   There also is no evidence that any of those defendants participated in the care provided to Tinsley during

---

[150] Doc. no. 53-5 (Deposition of Marvin Pietruszka, M.D.), at 159.

[151] *Id.*

[152] *Id.* at 26-29.

the period from November 3 through 6, 2013, while he was in the infirmary.

Shahla Poursaied testified unequivocally that she was not present or involved in the treatment of Mark Tinsley between the dates of October 28 and November 6, 2013,[153] and there is no evidence that she either was or should have been involved in his care during that time. Accordingly, she could not have been subjectively aware of his condition.

Plaintiff also has presented no evidence that Rose Jackson was subjectively aware of, but disregarded, any need for medical treatment between the dates of October 28 and November 6, 2013. Apart from a brief medical evaluation of Mark Tinsley's left foot and ankle on August 8, 2013, there are no medical records, nor any other evidence, indicating that Mark Tinsley ever requested medical attention from Rose Jackson, or that she provided him care on any date other than August 8, 2013. Similarly, there is no evidence that she was or should have been involved in Mark Tinsley's treatment during his stay in the infirmary from the evening of November 3, 2013, until he was transported to Crestwood Medical Center during the early morning hours of November 6, 2013.[154]

In addition, plaintiff asserts that Mark Tinsley should have been prescribed

---

[153] Doc. no. 51-5 (Poursaied Affidavit), ¶ 7; doc. no. 51-6 (Poursaied Deposition), at 58-71.

[154] Additionally, to the extent that plaintiff complains of the rules and procedures adopted by Corizon and/or the Alabama Department of Corrections (including only administering medications during pill call or requiring inmates to fill out a sick call form before being seen by a nurse or doctor), those policies have nothing to do with the medical defendants' subjective state of mind while treating (or failing to treat) Mark Tinsley.

antibiotics four days before he was admitted to Limestone's infirmary. The evidence does not support that contention. Natasha Lopez observed Mark Tinsley on October 29th, during pill call. He then complained of a running nose and sinus drainage. Lopez "confirmed that Mr. Tinsley would be seen the next morning by Charles Hooper" in the Health Care Unit. When Lopez next saw Mark Tinsley on October 31, 2013, he did not appear to be in any distress, and he did not request medical attention. No evidence in the record indicates that Lopez was subjectively aware that Tinsley's condition required additional treatment, or that she was deliberately indifferent to any medical need. In fact, Lopez acted prudently when conducting pill call in the E-Dorm on October 29, 2013, and in referring Tinsley to a more qualified health care provider the following day. She did not conduct pill call between the dates of November 1 and 3, and she did not have any contact with Mark Tinsley on those days.

Natasha Lopez was present in the infirmary during Tinsley's stay in that facility, but stated that she "did not participate in the care and treatment provided to [him] while he was in the infirmary from the evening of November 3, 2013 until he was sent to the hospital on the early morning of November 6, 2013."[155] There is no evidence that she was subjectively aware of, but disregarded, any of Mark Tinsley's medical needs, or that she ever refused to treat him.

---

[155] Doc. no. 52-1 (Lopez Affidavit), ¶19 (alteration supplied).

Accordingly, plaintiff has failed to establish the necessary elements of a deliberate indifference claim against defendants Shahla Poursaied, Rose Jackson, and Natasha Lopez, and summary judgment is due to be granted on plaintiff's Eighth Amendment claim for deliberate indifference to her decedent's serious medical needs.

**B.** **Count II — The deliberate indifference of Corizon Medical Services to the need to train its employees to diagnose and treat serious medical conditions**

Count II asserts a separate § 1983 wrongful death claim against defendant Corizon Medical Services, LLC, for alleged deliberate indifference to the need to train its employees to diagnose and treat serious medical conditions, such as those presented by plaintiff's decedent during his commitment in the Limestone Correctional Facility. The relevant allegations of that Count read as follows:

> 62. Defendant Corizon failed to adequately train and supervise Defendants Nurses and Medical Staff in the areas of medical treatment and care which were the direct cause of the death of Mark Tinsley. Defendants failed to adequately train and supervise Defendants Nurses and medical staff in treating patients who have shown blatant signs of severe medical illness and submitted numerous requests for emergency treatment.

> 63. It was foreseeable that the failure to adequately train, supervise, and discipline officers and medical staff who exhibit blatant and deliberate disregard for the constitutional rights of inmates, specifically in the area of adequate medical care, would cause injury or death. Such deliberate indifference and reckless disregard directly resulted in Mark Tinsley's injuries and subsequent death. Defendants' unnecessary and wanton infliction of pain violates the constitutional rights of those individuals the Defendants encounter.

64. Defendants therefore exhibited reckless disregard for, and deliberate indifference to, the constitutional right of Tinsley to receive adequate medical care and treatment while in the custody of the Alabama Department of Corrections at Limestone Correctional Facility. As a result of the acts and omissions of the Defendants, Tinsley suffered physical, emotional, and psychological injury leading up to his death.

Doc. no. 1 (Complaint), ¶¶ 62-64.

The failure of a state contractor such as Corizon to adequately train its employees as alleged in the preceding paragraphs "constitutes an actionable policy or custom for § 1983 purposes 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact.'" *Cook ex. rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1116 (11th Cir. 2005) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)) (alteration in original). "Failure to train can amount to deliberate indifference when the need for more or different training is obvious, . . . and when the failure to train is likely to result in the violation of a constitutional right." *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1397-98 (11th Cir.1994) (citation omitted, ellipsis supplied).

In general, a failure to train satisfies the subjective prong of the Eighth Amendment calculus, and imposes supervisory liability on a state contractor such as Corizon, where that failure demonstrates an indifference to the strong likelihood that, absent such training, the company's medical-staff employees would subject a prison inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to

serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Plaintiff, however, has presented very little evidence of Corizon's procedures or training protocols. She points to that portion of the deposition testimony of Certified Registered Nurse Practitioner Charles Hooper in which he testified that, even though Corizon did not provide training that focused specifically on the treatment of patients with obstructive sleep apnea, he believed "it would be helpful" to receive training on that condition and the use of CPAP machines.[156] Shahla Poursaied also testified that Corizon had not provided training focused specifically upon the condition of obstructive sleep apnea.[157] Jeffery Clark, the company's Regional Director of Nursing who was responsible for coordinating continuing nursing education for Corizon's operations in Alabama, confirmed that he had never asked the "site level people that are providing training to train on issues related to sleep apnea,"[158] but testified that he did not think it was necessary for nurses to receive training specifically focused upon that condition.[159]

In summary, plaintiff has presented very little evidence, and has offered no convincing argument,[160] that Corizon knew or should have known that failing to provide

---

[156] Doc. no. 52-5 (Charles Hooper Deposition), at 102.

[157] Doc. no. 51-6 (Poursaied Deposition), at 38-39.

[158] Doc. no. 68-14 (Jeffery Clark Deposition), at 48.

[159] *Id.* at 50.

[160] *See* doc no. 66 (Plaintiff's Responsive Brief), at 34-35.

its nurses with training focused specifically upon treatment for the condition of obstructive sleep apnea would have prevented the chain of events that led to Mark Tinsley's death.

> A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. [*Board of County Commissioners of Bryan County, Okla. v. Brown*, 520 U.S. 397, 409 (1997)]. Policymakers' "continued adherence to an approach that *they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action* — the 'deliberate indifference' — necessary to trigger municipal liability." *Id.*, at 407, 117 S. Ct. 1382. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick v. Thompson*, 563 U.S. 51, 62 (2011) (alteration and emphasis supplied).

Therefore, summary judgment is due to be granted on plaintiff's § 1983 wrongful death claim against Corizon for deliberately failing to train, or being deliberately indifferent to the need to train, medical personnel on how to treat obstructive sleep apnea.

## C.      Count III — Civil Conspiracy

The third Count of the complaint is the most inexplicable portion of a pleading that can only be described as confusing. Even so, it is not necessary to attempt to iron out its wrinkles, because "Plaintiff concedes that her Civil Conspiracy claims are due to be

dismissed."[161]

### D. Count IV — Negligent and Wanton Retention of Incompetent Correctional Officers and Medical Staff

The allegations of the fourth Count are, like many other aspects of the complaint, perplexing. The pertinent portions read as follows:

> 70. Defendants **Thomas** [*i.e., Kim Thomas, Commissioner of the Alabama Department of Corrections, who has been dismissed as a defendant*], **Naglich** [*i.e., Ruth Naglich, Associate Commissioner for Health Services for the Alabama Department of Corrections, who also has been dismissed as a defendant*], **Warden** [*i.e., Dewayne Estes, Warden of the Limestone Correctional Facility, who also has been dismissed as a defendant*], and **Corizon** [*i.e., Corizon Medical Services, LLC,*] had a duty to terminate the employment of Defendant Correctional Officers, Supervisors, Nurses, and Medical Staff who were known to be incompetent. The incompetence of said Correctional Officers, Supervisors, Nurses and Medical Staff was known to the Defendants Thomas, Naglich, Warden and Corizon as other inmates have become ill and subsequently died under the care, custody and control of the Alabama Department of Corrections or was discoverable had Defendants exercised care and due diligence.

> 71. Defendants negligently and/or wantonly retained Correctional Officers, Supervisors, Nurses, and Medical Staff despite their incompetence. These Defendants consciously retained Defendant Correctional Officers and Medical Staff knowing their interaction with inmates although there were incompetent to do so. Defendants also knew that by retaining these correctional officers and medical staff, injury and death would likely result.

> 72. These actions and/or inactions by Defendants Thomas, Naglich[,] Warden, and Corizon resulted in the death of Mark Tinsley.

---

[161] Doc. no. 66 (Plaintiff's Responsive Brief), at 36.

Doc. no. 1 (Complaint), ¶¶ 70-72 (boldface emphasis and alterations supplied).

In view of the dismissal of all parties named as defendants to the foregoing allegations except Corizon, it is especially difficult to understand the nature of and basis for plaintiff's claim(s) against that remaining entity. Regardless, the claim fails because of plaintiff's failure to present arguments in her brief supporting the allegations of Court IV. The law of this circuit is clear: issues and contentions not raised in a party's brief are deemed abandoned. *See, e.g.*, *Chapman v. AI Transport,* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him. There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations

and internal quotation marks omitted). Accordingly, summary judgment is due to be entered in favor of defendant Corizon on the claims alleged in Count IV.

## E. Count V — Section 1988 Wrongful Death

Count V of the complaint alleges that:

> 74. Defendants Correctional Officers, Supervisors, Nurses, and Medical Staff, exercising their position of authority and acting under the color of state law, unlawfully caused the death of Mark Tinsley under the Alabama Wrongful Death Statute when, 1) they intentionally refused to provide him with medical care and assistance; 2) failed to provide him with a C-PAP machine in a timely manner and/or failed to provide an adequate C-PAP machine after numerous requests; 3) refused to monitor his prescription medication intake as prescribed by a licensed physician; and 4) although he and other inmates were requesting, both formally and informally, immediate medical attention, [they did not] allow him to seek medical care in a timely fashion.

> 75. As a result of Defendants' actions, Mark Tinsley suffered pain and injuries until he ultimately died on November 15, 2013.

Doc. no. 1 (Complaint), ¶¶ 74-75 (alteration supplied).

Only two of the allegations contained in the foregoing paragraphs have not been addressed in the preceding parts of this opinion: *i.e.*, the contention that defendants refused to monitor Mark Tinsley's prescription medication intake as prescribed by a licensed physician; and, the assertion that, despite Tinsley's requests, "both formally and informally," for "immediate medical attention," defendants did not "allow him to seek medical care in a timely fashion." The weakness of those allegations lies in the same principles discussed under Count IV, *supra*. That is, plaintiff failed to present argument

supporting either contention in the brief submitted in opposition to summary judgment. Accordingly, summary judgment is due to be entered in favor of the remaining defendants on the claims alleged in Count V.

F.    **Supplemental State Law Claims**

The fourth paragraph of the complaint clearly states plaintiff's belief that she alleged supplemental state law claims: *i.e.*, "Plaintiff also invokes the supplemental jurisdiction of this Court for state law claims that arise from the same facts and circumstances under 28 U.S.C. § 1367." Doc. no. 1 (Complaint), ¶ 4; *see also* doc. no. 66 (Plaintiff's Responsive Brief), at 43 (arguing that the actions of Dr. Randall Stubbs, who died during the pendency of this action, "are still relevant to the liability of Corizon, both under Plaintiff's federal *and state law claims*") (emphasis supplied). Unfortunately, this court is not able to ascertain what those supplemental claims might be.

Regardless, the exercise of supplemental jurisdiction over claims based upon Alabama law is entirely discretionary. That is to say, in cases such as this one, in which the district court's original jurisdiction was based upon a federal question arising under the Constitution and laws of the United States, the court retains discretion to entertain state claims that are "supplemental" to the federal questions. *See* 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction when:

> (1)     the claim raises a novel or complex issue of state law,
>
> (2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)     *the district court has dismissed all claims over which it has original jurisdiction*, or
>
> (4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis supplied). The Supreme Court added a gloss to that statutory language in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988), which observed that

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant [now "supplemental"] state-law claims. When the balance of these factors indicates that a case properly belongs in state court, *as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain*, the federal court *should decline* the exercise of jurisdiction by dismissing the case without prejudice.

*Id*. at 349-50 (alteration and emphasis supplied) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)). The Supreme Court's opinion also observed that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent [*now called the* "supplemental"] jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining

state-law claims." *Carnegie-Mellon*, 484 U.S. at 350 n.7 (alteration supplied); *see also L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (stating that, "if the federal claims are dismissed prior to trial, [the Supreme Court's opinion in *United Mine Workers of America v. Gibbs, supra*] strongly encourages *or even requires* dismissal of state claims") (alteration and emphasis supplied).

Here, summary judgment has been entered in favor of defendants on all of plaintiff's federal claims. Accordingly, this court exercises its discretion to decline to exercise supplemental jurisdiction over any remaining state law claims, and dismisses those claims, without prejudice.

## V. CONCLUSION AND ORDERS

In accordance with the foregoing, defendants' motion for summary judgment is GRANTED. All claims asserted under 42 U.S.C. §§ 1983 and 1988 are DISMISSED with prejudice. Any supplemental state law claims are DISMISSED without prejudice. Further, plaintiff's motion to strike is DENIED, and defendants' motion to exclude plaintiff's expert is DENIED as moot. Costs are taxed to plaintiff. The Clerk is directed to close this file.

**DONE** and **ORDERED** this 26th day of June, 2017.

_____
United States District Judge